NOT DESIGNATED FOR PUBLICATION

No. 118,286

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

GLEN W. SMITH,
*Appellant*,

v.

RUSKIN MANUFACTURING,

and

INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA,
*Appellees*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed October 26, 2018. Affirmed.

*William L. Phalen*, of Pittsburg, for appellant.

*Vincent A. Burnett*, *Dallas L. Rakestraw*, and *Travis L. Cook*, of McDonald Tinker, of Wichita, for appellees.

Before BRUNS, P.J., MCANANY, J., and BURGESS, S.J.

PER CURIAM: In this workers compensation appeal, Glen W. Smith contends that the Workers Compensation Board (Board) erred in calculating his award and in finding his second back injury was merely an aggravation of an existing injury and not a new injury.

Smith's original work injury occurred on March 11, 2011, when he heard a loud pop and immediately began experiencing pain in his left testicle that extended from the

1

"[l]ower right side of [his] back and down to [his] left knee" after attempting to flip a 70-inch sheet of steel. He was diagnosed with a hernia and epididymitis. After surgical repair he continued to experience pain in his "left testicle, back, and knee, left knee." He was off work for five weeks and returned to light duty on May 2, 2011.

Smith saw Dr. Pedro Murati on May 5, 2011, with complaints of pain in his left groin and low back. Dr. Murati diagnosed Smith with hypogastric nerve and ilioinguinal nerve irritation and low back pain with radiculopathy. He recommended an MRI of the lumbar spine, epidural injections, bilateral lower extremity therapy, and pain medication.

Smith saw Dr. Michael Bolt on June 14, 2011, with pain in his left groin and back. Dr. Bolt said Smith would need a further evaluation for his back and discussed pain management with Smith for his groin pain.

Smith returned to full duty work in mid-June 2011. He was still in pain from his March injury.

On June 20, 2011, after returning to full-time work, Smith felt a sharp pain in his "lower back, right side" that traveled "straight down . . . through [his] right leg down to [his] toes" while he was lifting a piece of metal. He was treated with oral medication at the Labette County Hospital emergency room.

Smith returned to Dr. Bolt on June 24, 2011, with complaints of abdominal pain. Dr. Bolt noted that Smith ambulated well.

On October 24, 2011, Smith was evaluated by Dr. Joseph Galate for his low back pain and bilateral leg pain.

On November 15, 2011, Smith had an MRI taken of his back, which revealed limited multilevel degenerative disc changes but with no evidence of spinal stenosis or neuroforaminal encroachment. The MRI showed mild disc bulges, but there were no herniations.

On February 1, 2012, Smith saw Dr. Adrian Jackson for treatment of his low back pain. Dr. Jackson did not believe that Smith needed surgery on his back.

On March 30, 2012, Smith suffered an injury to his left index finger while at work. This injury is unrelated to this appeal, and we will not address it further.

On April 10, 2012, after determining that Smith had lied on his resume, Smith was suspended from his employment. His employment was ultimately terminated on April 24, 2012. Aside from some odd jobs, Smith remained essentially unemployed until May 1, 2015.

On October 2, 2013, Smith saw Dr. Vito Carabetta. He only told Dr. Carabetta about the March 11, 2011 accident and not his later June 20, 2011 injury. Based on this history, Dr. Carabetta opined that Smith's groin and back injury were caused by the March 11, 2011 accident. Later, after learning of the June 2011 injury, Dr. Carabetta expressed no opinion as to whether he would change his diagnosis to attribute some of Smith's back conditions to the June 2011 incident.

When he was deposed, Smith testified that he experienced pain in his right lower back when he was injured on March 11, 2011. He first stated that he felt the pain in his "[l]eft testicle" and "[l]ower right side of [his] back and down to [his] left knee." When prompted by counsel to change his description of the pain to the lower left side of his back, Smith corrected his counsel and stated the pain occurred in the "[l]ower right side of the back, down to [his] left knee." In a second deposition, Smith stated that he "felt

3

pain in [his] low back, [his] abdomen, [his] left testicle, down to [his] left knee" when he was injured on March 11, 2011. He also testified that he injured his low back and right lower extremity on June 20, 2011, resulting in a sharp pain "[i]n [his] lower back, right side."

During his deposition, Dr. Bolt testified that Smith was experiencing back pain when he began treating him on June 14, 2011. But he noted that Smith only mentioned the back pain in passing.

Dr. Chris Fevurly testified at his deposition that the MRI taken on November 15, 2011, showed a mild degenerative disc disease with disc bulges and that these injuries resulted from the natural living and aging process and not from a specific injury. He opined that Smith's lower back pain and groin pain were the result of his March 11, 2011 injury, and that Smith had the same symptoms in May 2011 that he had after the June 20, 2011 incident. From this he concluded that Smith did not sustain a new impairment on June 20, 2011.

Dr. George Fluter stated in his deposition that he examined Smith on May 20, 2013; December 23, 2014; and May 5, 2015. He opined that Smith had low back pain and right leg pain associated with probable radiculitis in his right leg, lumbar discopathy, and lumbosacral sprain/strain. He testified that the MRI showed that Smith had sustained an annular tear at the L5-S1 disc. According to Dr. Fluter, these injuries were caused by the accident that occurred on June 20, 2011, and that this accident was the prevailing factor in the injury. In Dr. Fluter's opinion, the injuries to Smith's left side occurred on March 11, 2011, and the injuries to Smith's right side occurred on June 20, 2011. In his medical report, Dr. Fluter stated that the MRI revealed disc degeneration with disc displacement.

Smith filed three separate disability claims: (1) for the March 11, 2011 accident in which he alleged that he sustained a hernia and a low back strain; (2) for the June 20,

4

2011 incident in which he alleged that he sustained a back injury; and (3) for the unrelated March 30, 2012 injury to his left index finger. We need not enumerate the various findings and awards by the administrative law judge (ALJ) because Smith appealed to the Board, and the Board considered the matter de novo and made its own findings and conclusions and entered its own award.

In its de novo review the Board found that all of Smith's lower back injuries and groin injuries occurred during the March 11, 2011 incident and that Smith did not sustain a new injury on June 20, 2011. The Board noted that Dr. Fluter's opinion supported a claim of a second injury but other, more convincing evidence supported the contention that Smith sustained all of his injures on March 11, 2011. That other evidence established that Smith complained of back pain to Dr. Bolt before the June 20, 2011 accident; that when he saw Dr. Carabetta, Smith failed to mention the June accident; and that Dr. Fevurly opined that Smith's back injury resulted from the March 11, 2011 accident.

The Board found that Smith sustained a 4% whole body functional impairment for his groin injury and a 5% whole body functional impairment for his low back injury, resulting in a total body impairment of 9%.

The Board also found that Smith sustained a 36% task loss and that he sustained a 100% wage loss between April 24, 2012, and May 1, 2015, resulting in a work disability rating of 68%. Further, the Board found that Smith sustained a 36% task loss and a 45% wage loss after May 1, 2015, resulting in a work disability rating of 40.25%. The Board modified the ALJ award to show that Smith is

> "entitled to 2.33 weeks of temporary total disability benefits at the rate of $363.55 per week, or $847.07. Based upon [Smith's] 9 percent (4 percent for his groin and 5 percent for his low back) whole body functional impairment he is entitled to 37.35 weeks (415 weeks x 9 percent = 37.35 weeks) of permanent partial disability benefits at the rate of

$363.55 per week, or $13,578.59, all of which is due and owing. Commencing April 24, 2012, [Smith] is entitled to 68 percent work disability, or not more than 244.85 weeks (415 weeks x 68 percent = 282.2 weeks – 37.35 weeks = 244.85 weeks). From April 24 through April 30, 2012, [Smith] is entitled to one week of permanent partial disability benefits at the rate of $363.55 per week, or $363.55, and from May 1, 2012, through April 30, 2015, a period of 156.43 weeks, [Smith] is entitled to $406.87 per week, or $63,646.67, all of which is due and owing.

"The parties agreed that commencing May 1, 2015, [Smith] had a 44.5 percent wage loss which, averaged with the 36 percent task loss determined by the judge and the Board, results in a 40.25 percent work disability, or not more than 129.69 weeks of permanent partial disability benefits (415 weeks x 40.25 percent = 167.04 weeks – 37.35 weeks = 129.69 weeks). Using the calculation method in *Wheeler* [*v. Boeing Co.*, 25 Kan. App. 2d 632, 967 P.2d 1085 (1998)], [Smith] is not entitled to any permanent partial disability benefits for this period of time because all permanent partial disability benefits owed to claimant were already paid.

"In summary, [Smith] is entitled to $847.07 for temporary total disability benefits, $13,578.59 for his 9 percent whole body functional impairment and $64,010.22 for his 68 percent work disability, for a total award of $78,435.88, all of which is due and owning, less any amounts previously paid."

With respect to Smith's claim arising out of the June 20, 2011 incident, the Board found that Smith did not sustain a back injury by accident arising out of and in the course of his employment on that date. The Board found that the accident on June 20, 2011, was not the prevailing factor causing Smith's back injury. Based on these findings, the Board awarded Smith nothing for this claim.

Smith's appeal from the Board's decision brings the matter to us.

*The Calculation of Smith's Award*

Smith claims that the Board erred in finding that he was not entitled to any permanent partial disability (PPD) for the period after May 1, 2015, because the Board

6

found he had already been paid all the permanent partial disability benefits permitted under the statute.

Smith argues that he was not paid for the entire 415 weeks permitted by statute and that the Board used the incorrect method to calculate his disability. He asserts that K.S.A. 44-510e is ambiguous with respect to how to calculate his disability reward when his disability rating changed during the 415-week period. He asserts that the Board should have used the method of calculation that was used before the 1993 statutory amendment, because it is the only interpretation that gives full effect to the express language of the statute requiring the disability to be fully paid.

We have unlimited review of questions involving statutory interpretation and owe no deference to the agency or Board's interpretation. *Fernandez v. McDonald's*, 296 Kan. 472, 475, 292 P.3d 311 (2013); *Le v. Armour Eckrich Meats*, 52 Kan. App. 2d 189, 193, 364 P.3d 571 (2015). When interpreting a statute, we first look to the plain language to determine the legislative intent. If the language of the Legislature is unambiguous, we apply the plain language of the statute to the facts. *Hoesli v. Triplett, Inc.*, 303 Kan. 358, 362, 631 P.3d 504 (2015). If the language of the statute is unclear or ambiguous, we then apply the cannons of construction to ascertain the intent of the Legislature. 303 Kan. at 362.

In workers compensation cases, the statute in effect at the time of the claimant's injury governs the rights and obligations of the parties. See *Bryant v. Midwest Staff Solutions*, *Inc.*, 292 Kan. 585, 588, 257 P.3d 255 (2011). Here, Smith's injuries occurred in March 2011 when the 1996 Workers Compensation Act was in effect, so the 1996 Act governs. See K.S.A. 44-510e. The calculation method set forth in the 1996 Act reflects the changes the Legislature enacted in 1993. See L. 1993, ch. 286, § 34. This method of calculation is different than the pre-1993 method of calculation. See *Wheeler v. Boeing Co.*, 25 Kan. App. 2d 632, 633-34, 967 P.2d 1085 (1998).

7

The 1996 Workers Compensation Act provides in part:

"The amount of weekly compensation for permanent partial general disability shall be determined as follows:

"(1) Find the payment rate which shall be the lesser of (A) the amount determined by multiplying the average gross weekly wage of the worker prior to such injury by $66^2/_3\%$ or (B) the maximum provided in K.S.A. 44-510c and amendments thereto;

"(2) find the number of disability weeks payable by subtracting from 415 weeks the total number of weeks of temporary total disability compensation was paid, excluding the first 15 weeks of temporary total disability compensation that was paid, and multiplying the remainder by the percentage of permanent partial general disability as determined under this subsection (a); and

"(3) multiply the number of disability weeks determined in paragraph (2) of this subsection (a) by the payment rate determined in paragraph (1) of this subsection (a).

"The resulting award shall be paid for the number of disability weeks at the full payment rate until fully paid or modified. If there is an award of permanent disability as a result of the compensable injury, there shall be a presumption that disability existed immediately after such injury. In any case of permanent partial disability under this section, the employee shall be paid compensation for not to exceed 415 weeks following the date of such injury, subject to review and modification as provided in K.S.A. 44-528 and amendments thereto." K.S.A. 44-510e(a).

Under this statute, the Legislature determined that the rate of pay should remain consistent but that the duration of the payment should change in accordance with the disability rating. K.S.A. 44-510e(a); see *Wheeler*, 25 Kan. App. 2d at 636-37. This is different than the pre-1993 method under which the duration remained the same but the rate of pay could change in accordance with the disability rating. See K.S.A. 1992 Supp. 44-510e(a). The 1993 amendment changed the payment system from one that allowed an injured party to receive a lower payment for a longer period of time to one that allows the injured party to recover a greater payment for a shorter period of time. See *Wheeler*, 25 Kan. App. 2d at 633-34.

Smith asserts that he did not receive the full benefit of his disability award. He claims that he should have been awarded PPD at a disability rating of 40.25% for the period after May 1, 2015, when he began working a new job. He claims the Board concluded that he should receive 245 weeks of PPD for his disability rating of 68% but that the period that this disability rating lasted was only 160.43 weeks; thus he would still have 200.86 weeks remaining to be paid. He asserts that when this is calculated with the 40.25% disability rating, he would be entitled to 80.84 weeks of PPD for the period commencing May 1, 2015.

The Board calculated the duration of payment to be 244.85 weeks based on a disability rating of 68%, but the Board only awarded money for 157.43 weeks of that 244.85 week period. The Board also found that Smith was entitled to 129.69 weeks of disability based on a disability rating of 40.25% for the period commencing May 1, 2015, but that he was not entitled to a payment for this period because he had already been compensated for a period greater than the 129.96 weeks, and his employer should be given credit for that payment.

In *Wheeler*, the court determined that the injured Wheeler should not receive additional benefits when he had previously been paid benefits for a longer duration than was calculated for the new period. 25 Kan. App. 2d at 634-38.

Wheeler was injured while working and was forced to take time off to recover. During this time, Wheeler was paid 24.5 weeks of temporary total disability (TTD). When Wheeler was healthy enough to return to his job, his position had been eliminated. Wheeler received only 115.14 weeks of his disability benefits before his employer hired him for a different job making similar wages to those that he earned prior to his injury. Once he was employed, his disability rating was reduced to 10.5%. Based on this new disability rating, Wheeler was entitled to 42.58 weeks of disability compensation. This court held Wheeler's employer had to be given credit for the time it had already paid him

for disability, so he was not awarded any additional compensation for this 42.58-week period. This court reasoned that allowing for additional compensation would require the employer to pay a sum greater than the maximum permitted by statute. 25 Kan. App. 2d at 634-38.

In *Wheeler*, this court interpreted the same statute that was applicable to Smith's case. Based on the reasoning in *Wheeler*, the full payment of the disability is based on the final disability rating. Thus, when the final disability rating is a shorter period than that which was previously paid, the final rating will have been paid in full. Therefore, the pre-1993 method of calculation is not the only method that could comply with the statute.

This court followed the holding in *Wheeler* in *Ponder-Coppage v. State*, 32 Kan. App. 2d 196, 200, 83 P.3d 1239 (2002). In *Ponder-Coppage*, the claimant suffered a workplace injury in August 1994. She received an award of 20.66 weeks of disability based on a disability rating of 5%. In 1997, claimant's pain increased. When she filed to adjust her disability rating, her disability rating increased to 23%. Based upon the increased disability rating, claimant was awarded 74.39 weeks of disability, thus showing that the employer must be given credit for the weeks already paid when granting the new award and showing that when the final disability is greater, there is still an amount to be paid in order to be paid in full.

Following the reasoning in *Wheeler*, Smith had already been compensated for 157.43 weeks when he received a new disability rating that would allow him to recover disability compensation for 129.96 weeks. His employer was entitled to credit for the 157.43 weeks when calculating the award for the 129.96-week period. See 25 Kan. App. 2d at 635-38. Because the credit was greater than the weeks owing, Smith was not entitled to any additional compensation for this period.

Smith contends that the *Wheeler* decision does not comply with the plain language of the statute. He asserts that K.S.A. 44-510e "provides specifically that payment shall be made for the number of disability weeks until paid in full." He argues that *Wheeler* is no longer good law because it was decided before *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607-08, 214 P.3d 676 (2009), which requires us to give effect to the plain language of the statute when it is plain and unambiguous, which the *Wheeler* court did not do.

The court in *Bergstrom* held that "[w]hen a workers compensation statute is plain and unambiguous, this court must give effect to its express language rather than determine what the law should or should not be." 289 Kan. at 607-08. This has always been true in any case involving statutory analysis. When considering the plain language of a statute, we give each word in the statute its ordinary meaning. See *Hoesli*, 303 Kan. at 362.

Smith's analysis of a sentence in K.S.A. 44-510e fails to take into account the entire sentence. K.S.A. 44-510e provides in pertinent part, "The resulting award shall be paid for the number of disability weeks at the full payment rate until fully paid *or modified*." (Emphasis added.) Smith fails to consider this "or modified" part of the sentence.

The plain language of K.S.A. 44-510e shows that the Legislature intended for the disability award to be paid until the award was modified. There is nothing in the statute that prevents the Board from modifying an award in the manner it did here. In fact, such a modification is what the *Wheeler* opinion allows. Under *Wheeler*, once the award is modified, the prior payment schedule ceases and the new payment begins. When the new payment schedule beings, the employer is given credit for the time already paid and the new award is reduced by that credit.

11

In Smith's case, his award continued in effect until modified. The Board gave him 244.85 weeks of disability based on a rating of 68%. The Board modified this award to reflect a change in Smith's disability rating after 157.43 weeks. The Board awarded Smith 129.69 weeks of disability based on the new rating of 40.25%. The Board then gave the employer credit for the amount already paid and reduced the new award by that amount. At that point Smith had already been compensated for an amount that was greater than the new award, so he did not receive any additional benefits.

To find to the contrary would run afoul of the plain language of K.S.A. 44-510e(a), which provides that "the employee shall receive weekly compensation as determined in this subsection during such period of temporary or permanent partial general disability *not exceeding a maximum of 415 weeks*." (Emphasis added.) If the modified award were not to have been reduced by the amount previously paid, the employer would have been subject to a greater assessment than allowed by statute.

Based on the foregoing, we conclude that the Board did not err in calculating Smith's award.

*Whether Smith Sustained a Compensable Injury on June 20, 2011*

Smith asserts that the Board erred in finding that he did not suffer an additional injury on June 20, 2011. In support of this assertion, Smith claims that there was no evidence of right low back pain or right leg pain before the June 20, 2011 incident. He also asserts that the Board disregarded uncontroverted evidence by Dr. Fluter that he suffered an annular tear at the L5-S1 disc region on June 20, 2011.

We review a challenge to the Board's factual findings in light of the record as a whole to determine whether the findings are supported by substantial competent evidence. See K.S.A. 2017 Supp. 77-621(c)(7). "This analysis requires the court to (1)

12

review evidence both supporting and contradicting the agency's findings; (2) examine the presiding officer's credibility determination, if any; and (3) review the agency's explanation as to why the evidence supports its findings." *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014). We do not reweigh the evidence or engage in de novo review. 299 Kan. at 795.

The claimant has the burden "to establish the claimant's right to an award of compensation and to prove the various conditions on which the claimant's right depends." K.S.A. 2017 Supp. 44-501b(c). The burden of proof in a workers compensation claim means "the burden of a party to persuade the trier of facts by a preponderance of the credible evidence that such party's position on an issue is more probably true than not true on the basis of the whole record." K.S.A. 2017 Supp. 44-508(h).

The law controlling the matter is the law in effect at the time of the injury. See *Bryant*, 292 Kan. at 588. Here, Smith's claimed new injury occurred on June 20, 2011, after the 2011 amendments to the workers compensation laws went into effect on May 15, 2011. Thus, K.S.A. 2011 Supp. 44-501 et seq. will be controlling.

Under K.S.A. 2011 Supp. K.S.A. 44-508(f)(2),

"[a]n injury is compensable only if it arises out of and in the course of employment. An injury is not compensable because work was a triggering or precipitating factor. An injury is not compensable solely because it aggravates, accelerates or exacerbates a preexisting condition or renders a preexisting condition symptomatic."

Under K.S.A. 2011 Supp. 44-508(f)(1), an "injury" means "any lesion or change in the physical structure of the body, causing damage or harm thereto." Under K.S.A. 2011 Supp. 44-508(f)(2)(B), an accidental injury "arise[s] out of employment only if: (i) There is a causal connection between the conditions under which the work is required to be

13

performed and the resulting accident; and (ii) the accident is the prevailing factor causing the injury, medical condition, and resulting disability impairment."

"When a claimant's prior injury has never fully healed, subsequent aggravation of that same injury, even when caused by an unrelated accident or trauma, may be a natural consequence of the original injury, entitling the claimant to" a greater award for the prior injury but not to a separate compensation award. See *Logsdon v. Boeing Co.*, 35 Kan. App. 2d 79, Syl. ¶ 3, 128 P.3d 430 (2006).

The Board found that Smith's injury did not arise out of his employment on June 20, 2011, and that the accident on June 20, 2011, was not the prevailing factor in Smith's injury. The Board found that the weight of the evidence showed that Smith's injury arose during the March 11, 2011 accident.

Here, there is contrasting testimony from two expert witnesses—Dr. Fluter and Dr. Fevurly. Dr. Fluter testified that Smith suffered an additional injury on June 20, 2011. Dr. Fevurly testified that Smith merely aggravated the injury he sustained on March 11, 2011. Each of the expert witnesses reviewed the MRI and came to the conclusion that it revealed a degenerative disc problem. Dr. Fluter opined that the annular tear at the L5-S1 disc region arose from the accident on June 20, 2011. Dr. Fevurly opined that the injury resulted from the natural human aging process and not from a specific injury.

The Board found that Smith's position was "bolstered" by the testimony of Dr. Fluter. But the Board found that the opinion expressed by Dr. Feverly was equally credible. Thus, the Board looked to other evidence to resolve this issue.

The other evidence shows that Smith sought out care for back pain before June 20, 2011. Smith testified that when the accident occurred on March 11, 2011, he heard a loud pop and immediately began experiencing pain in his left testicle that extended from the

14

"[l]ower right side of [his] back and down to [his] left knee." He first consulted Dr. Murati about his low back pain on May 5, 2011, and Dr. Murati ordered an MRI on Smith's back after diagnosing him with low back pain with radiculopathy during that visit. Smith then saw Dr. Bolt on June 14, 2011, to whom he complained of back pain. Dr. Carabetta opined that Smith's back injury occurred as a result of the March 11, 2011 accident. When Smith saw Dr. Carabetta, he failed to mention the June 20, 2011 accident. Further, Smith testified that he was still experiencing pain from the first injury when the second incident occurred on June 20, 2011.

Contrary to Smith's assertion, the Board did not disregard uncontroverted evidence of the annular tear. Dr. Fluter and Dr. Fevurly had different opinions on the cause of the injury, and Smith's own testimony controverted the evidence presented by Dr. Fluter.

With the experts being given equal weight, the remaining evidence supports the Board's findings that the accident on June 20, 2011, was not the prevailing factor for Smith's back injury. Smith had the burden to prove that the June 20, 2011 accident was the prevailing factor, and there is substantial evidence for the Board to find that he failed to meet this burden.

Because Smith failed to meet his burden of proving the Board erred, the remaining issue of the nature and extent of disability for the June 20, 2011 accident is moot.

Affirmed.